UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CRAIG O'NEIL

Defendant

Criminal Action No.
No. 20-CR-00371

## SENTENCING MEMORANDUM ON BEHALF OF CRAIG O'NEIL

KING & SPALDING LLP
Zachary Fardon
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
+1 312 764 6960

*Attorney for Defendant Craig O'Neil*

August 15, 2024

# PRELIMINARY STATEMENT

More than five years ago, Craig O'Neil faced a crossroads in his life. Mr. O'Neil grew up in a poor and abusive household. Over decades, he struggled with mental health issues and addiction, including chronic drug and alcohol abuse. That abuse coincided with, and perhaps contributed to, other bad choices, including his participation in the scheme at issue here.

When confronted by the government in this matter, Mr. O'Neil decided to change, accept responsibility, make amends, stop self-abuse, live lawfully, be a better husband and father, and approach every day at peace with himself and the world.

He has succeeded. In the years since, he obtained help through intensive therapy; completely quit drugs and alcohol; sought and received forgiveness from those he loves most; became a better husband and father; complied with all pretrial conditions, including gainful employment; and found peace and joy in everyday life.

As part of that journey, Mr. O'Neil also cooperated extensively. He met with the government in this matter (virtually or otherwise) a dozen or more times. He testified truthfully against his co-defendants at trial. And extraordinarily, he provided information to several other prosecutors and investigators in other districts across the country to aide their investigations.

Mr. O'Neil sincerely regrets his criminal offense., and he is incredibly thankful for the crossroads and the lifechanging opportunity.

For the reasons described below, we respectfully submit that a below-Guidelines non-custodial sentence of probation or home confinement, coupled with significant community service, would best serve the purposes of 18 U.S.C. § 3553(a).

## I.    BACKGROUND AND OVERVIEW

On July 30, 2020, Mr. O'Neil pleaded guilty to one count of conspiracy to pay and receive kickbacks for his role in a scheme where KP Network ("KPN"), a company managed by Mr. O'Neil, marketed to Medicare-eligible patients, obtained signed prescriptions for orthotic braces from the patients' physicians, referred those patients to a durable medical equipment (DME) manufacturer (Pakmed) and pharmacy (Symed) that dispensed those braces, and then received a percentage of the Medicare payments that the pharmacy received for those braces. Mr. O'Neil submits this memorandum to assist the Court in determining an appropriate sentence under the United States Sentencing Guidelines and Title 18 of the United States Code.

Within the Seventh Circuit, "a sentencing court must first correctly calculate the advisory Guidelines range . . . [and then] the defendant must be given the opportunity to bring to the court's attention any factors under 18 U.S.C. § 3553(a) that might warrant a sentence below the Guidelines range." *United States v. Jones*, 696 F.3d 695, 700 (7th Cir. 2012). Under 18 U.S.C. § 3553, the following factors are relevant in fashioning a sentence: the Guidelines-recommended sentencing range, the defendant's history and personal characteristics, the nature and circumstances of his offense, the kinds of sentences available to him, the need to avoid disparities amongst similarly situated defendants, and his need to provide restitution to any victims. 18 U.S.C. § 3553(a). Section 3553 directs the Court to consider these factors and impose a sentence that is "sufficient, but not greater than necessary," to serve the following purposes:

- "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- to afford adequate deterrence to criminal conduct;
- to protect the public from further crimes of the defendant; and
- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

*Id.* § 3553(a)(2).

For Mr. O'Neil's advisory Guidelines range, the Probation Office's pre-sentence report (PSR) calculates a total offense level of 25, with a presumptive Guidelines range of 57–71 months incarceration. Subject to a plea agreement addendum between the parties that Mr. O'Neil expects to be filed before the sentencing hearing, the parties agree that the subsequent adoption of Sentencing Guideline § 4C1.1 now results in total offense level of 23, with a presumptive Guidelines range of 46–57 months. *See* Joint Status Report, ECF 48 (explaining forthcoming plea addendum). In addition, for purposes of calculating the Guidelines range, the PSR calculates the "greater of the amount of the bribe or the benefit conferred [by the bribe]" as roughly $24.2 million, reflecting the government's assessment of the entire amount paid by government payors because of the scheme. Mr. O'Neil respectfully submits that this is not the correct figure for calculating the "greater of the amount of the bribe or the benefit conferred" under Sentencing Guidelines § 2B4.1, because it fails to deduct the direct costs of the arrangement at issue, as provided by § 2B4.1 and governing case law. Instead, as detailed below, Mr. O'Neil submits that a more accurate loss calculation is approximately $17.6 million. Regardless, because of the wide range provided by § 2B4.1—a 20-level enhancement for losses between $9,500,000 and $25,000,000—the applicable and agreed Guidelines range here does not change. Mr. O'Neil  raises the loss calculation only for context when determining the appropriate sentence.

Mr. O'Neil anticipates that the government will submit a motion under § 5K1.1 of the Guidelines outlining Mr. O'Neil's substantial assistance and cooperation in this and other cases and recommending a sentence below the presumptive Guidelines range. Mr. O'Neil's cooperation was extensive and extraordinary – lasting over five years, including through the COVID pandemic, and crossing multiple matters and jurisdictions. We respectfully submit that when considered in light of the § 3553(a) factors, Mr. O'Neil's extraordinary cooperation justifies a sentence of probation or home confinement coupled with extensive community service.

Other critical factors supporting a non-custodial sentence here include:

1. Without diminishing the seriousness of his offense, which Mr. O'Neil understands and accepts, Mr. O'Neil's case is different than the paradigmatic kickback offense, where doctors and other prescribers receive illegal remuneration in return for prescribing services or goods. Mr. O'Neil's kickback agreement involved no remuneration or payment to the actual prescribing physicians; nor were the prescriptions obtained by third-party providers who had no relationship with the patients—for all the orthotics braces at issue in this matter, a prescription was obtained from the patient's self-identified doctor. As such, the physicians' gatekeeping function was not directly impacted here.

2. The driving factor behind the Guidelines-recommended sentencing range is the 20-level increase in the Base Offense Level under Section 2B4.1 and Section 2B1.1(b)(1)(I) (the "Guideline Loss Table"). Relying too formalistically on that loss-driven range here would thwart the purposes of § 3553(a) in that it risks (a) overstating Mr. O'Neil's personal benefit from the scheme, and (b) failing to account for the fact that the marketing and patient recruiting services provided by Mr. O'Neil could have been structured and provided in a manner that complied with the requirements of the Anti-Kickback Statute and its safe harbors.

3. Similarly situated defendants, including Mr. O'Neil's co-conspirator who provided the same types of marketing and lead generation services to the conspiracy, have received sentences well below the advisory Guidelines range (including non-custodial sentences), counseling in favor of a non-custodial sentence to avoid unwarranted sentencing disparities.

4. Mr. O'Neil is a devoted and present husband, stepfather, and son who provides vital economic support to his spouse, stepdaughter, and parents, and a lengthy prison term could have devastating and irreversible effects on his family.

5. For the four years since his guilty plea, Mr. O'Neil has demonstrated that he presents no risk of recidivism, that he has accepted responsibility for his crime, and that incarceration would not further the purposes of § 3553(a).

For those reasons, we respectfully request that the Court impose a non-custodial sentence of probation or home confinement, paired with significant community service requirements.

## II.     CRAIG O'NEIL'S HISTORY AND CHARACTERISTICS

Craig O'Neil has worked to overcome difficult personal circumstances to become a person of enormous compassion, hard work, and generosity. Mr. O'Neil's wife, stepdaughter, parents, friends, coworkers, and acquaintances have submitted letters to the Court on behalf of Mr. O'Neil. See Attachment A, Collected Letters of Support.[1] Taken together, these letters reveal a person who, despite his failures, is devoted to his family, dedicated to his friends, and committed to his community, the arts, and the less fortunate. Mr. O'Neil's friends and family attest to his compassion and consistent willingness to help others in need.

### a.     Mr. O'Neil's Personal History and Background

From the very beginning of his life, Craig O'Neil has faced turmoil and instability. Mr. O'Neil was born in 1978 in Bridgeport, Connecticut to Dianne Law (nee Smith) and Frank Lee. Mr. O'Neil has never met his biological father, and until he was thirteen years old, believed that his mother's then-husband, Dan O'Neil (whom he still refers to as his father) was his biological father. As noted in his parents' letters, Mr. O'Neil's childhood home life was chaotic and unstable. His parents' marriage was

---

[1] Several of the letters submitted on Mr. O'Neil's behalf include personal contact information like email addresses, phone numbers, or personal home addresses, which have been redacted. See Fed. R. Crim. P. 49.1(a)(requiring redaction of home addresses). In addition, one letter describes a sensitive personal situation that is entirely unrelated to this matter, but which is included to illustrate Mr. O'Neil's character and support for the letter writer. That information has been redacted in the version that has been filed on the public docket. Mr. O'Neil will separately move to file an unredacted copy of that sentencing letter under seal.

turbulent. Mr. O'Neil's father was a Vietnam veteran who suffered from post-traumatic stress disorder, and his mother drank heavily until a month before Mr. O'Neil was born, and then frequently took Mr. O'Neil with her to Alcoholics Anonymous meetings as a young boy. Attachment A-1, Dan O'Neil Letter; Attachment A-2, Dianne Law Letter.

When Mr. O'Neil was seven or eight years old, his parents divorced, and a couple years later, he moved to Sarasota, Florida with his mother. During this period, his mother had more than one boyfriend who physically abused Mr. O'Neil, including one romantic partner who broke into the family home, attempted to kill the family dog, held Mr. O'Neil against a wall by his throat, and eventually forced Mr. O'Neil and his mother to live in a rape crisis center for a period of time. PSR, ¶ 49.

As an adolescent, Mr. O'Neil frequently ran away from home, and would stay with friends or in youth shelters. Attachment A-5, Diane Piper Letter; PSR, ¶ 51. He associated with a group of dangerous teenagers and engaged in petty crime and fighting. PSR, ¶ 51. As a young teenager, Mr. O'Neil began drinking and experimenting with drugs like marijuana, ecstasy, and cocaine. By the time he was fifteen years old, he stopped living at home permanently. He was placed with an elderly man, with whom he lived until he turned eighteen years old. Although this person provided a home and a semblance of economic stability, he also subjected Mr. O'Neil to constant sexual overtures and pressure. PSR, ¶ 72.

As a young adult, Mr. O'Neil began to achieve some limited stability in his life and became focused on maintaining employment and building a career. From 2000 through 2008, he worked in several jobs, from selling vacuum cleaners to working for internet providers and advertising companies. He eventually developed a relatively stable career in the digital marketing and lead generation industry.

### b. Mr. O'Neil's Struggles with Mental Health and Addiction

Throughout his life, Mr. O'Neil has suffered from mental health and substance abuse challenges. As a teenager, Mr. O'Neil participated in multiple mental health counseling programs, and was admitted on more than one occasion to an inpatient mental health facility to address his behavioral and emotional instability. As noted above, Mr. O'Neil began drinking and experimenting with drugs as a young teenager and has used at various times in his life marijuana, cocaine, ecstasy, butane, GHB, LSD, and methamphetamine. PSR, ¶¶ 81–87. In the years leading up to his current offense and guilty plea, Mr. O'Neil struggled particularly with alcohol and cocaine abuse, frequently drinking heavily and to intoxication, and using cocaine multiple times per week. PSR, ¶¶ 82, 84.

The 2019 investigation that led to his 2020 guilty plea placed enormous strain on Mr. O'Neil's mental health and well-being. In his letter to the Court, Mr. O'Neil's father recalls driving to meet Craig in the middle of "mental meltdown," and described him as a "broken person." Attachment A-1, Dan O'Neil Letter. Mr. O'Neil suffered from severe anxiety and depression during this period, and began preparing to commit suicide, though he was stopped from doing so because of his love for his family. PSR, ¶ 73; Attachment A-3, Charo O'Neil Letter.

Faced with the current investigation, Mr. O'Neil admirably chose to accept responsibility for both his criminal offense and his personal circumstances. He committed to becoming clean and sober and has not used alcohol or drugs since mid-2019. Mr. O'Neil sought mental health assistance and participated in therapy treatment with Dr. Jason Quintel of Sarasota, Florida, who informed the Probation Officer of his opinion that Mr. O'Neil "is interested in becoming a better version [of himself]" and "has done an amazing job of changing his life for the better." PSR, ¶ 75.

### c. Mr. O'Neil's Devotion to Family and Friends

The letters submitted by Mr. O'Neil's friends and family portray a person who, despite his own challenges and personal failures, is an unfailingly devoted, kind, and generous husband, stepfather, son, friend, and colleague.

In her letter to the Court, Mr. O'Neil's wife Charo explains that he is a loving, responsible, and generous spouse, as well as an exemplary father figure to her daughter Zoe. Mr. O'Neil provided stability to their lives during a difficult time and has served as an active and loving souse and parent before, during, and throughout his current ordeal. Attachment A-3, Charo O'Neil Letter. Mrs. O'Neil explains that despite the stress, anxiety, and depression generated by his offense and pending sentencing, Mr. O'Neil has worked to provide economically for his family, and has struggled with doubts and fears about how they will be provided for if he is incarcerated. *Id.* She further notes that Mr. O'Neil has become clean and sober, received treatment, and has become more patient, understanding, and peaceful in the years following his guilty plea. *Id.*

Mr. O'Neil's stepdaughter Zoe similarly describes him as a loving and compassionate parent who accepts and loves her unconditionally, who supported her and her mom as a young child, checks in with her daily to make sure she's doing well, and is always willing to help her navigate her own life challenges by explain how he learned to respond to his own adversity and failings. Zoe describes Mr. O'Neil's willingness to help her with her own emotional challenges and anxiety, and his efforts to shield her from his criminal offense and plea, despite the enormous strain he was under. She also notes that Mr. O'Neil has undergone a personal transformation in the years since his guilty plea, becoming more kind, accepting, compassionate, and less concerned with outward success and material well-being. Attachment A-4, Zoe Alarcon Letter.

Mr. O'Neil maintains a strong and devoted relationship with both of his parents, despite their complex personal history. He speaks to both parents regularly and is a devoted son— his friend Jay-

Me Busekist describes him as "a son that drops everything anytime [his parents] need him." Attachment A-6, Jay-Me Busekist Letter. Mr. O'Neil's father resides in a home that Mr. O'Neil owns, and his father serves as a confidant and emotional support to him. Attachment A-1, Dan O'Neil Letter. Mr. O'Neil similarly maintains a strong relationship with his mother and stepfather, remaining in frequent contact and supporting them however he can. Despite his own economic challenges, Mr. O'Neil recently paid for his mother to visit a bereaved sibling across the country. Attachment A-3, Charo O'Neil Letter. In 2018, when Hurricane Michael hit the Florida panhandle, he immediately drove up to his mother's home to help provide tarps, water, clothes, and other supplies for his mother, stepfather, and many of their elderly friends. Attachment A-3, Charo O'Neil Letter; Attachment A-2, Dianne Law Letter.

### d. Mr. O'Neil's Commitment to Community Engagement and Service

Since long before his criminal offense and guilty plea, Mr. O'Neil has been a dedicated advocate for his local community, with a focus on supporting the Florida arts community and individuals recovering from addiction.

In the mid-2000s, Mr. O'Neil and his father purchased a condominium in Gainesville, Florida to serve as temporary housing for women in early addiction recovery. As someone who struggled with addiction himself, Mr. O'Neil's father observed that there were insufficient housing opportunities for local women leaving rehabilitation programs. Mr. O'Neil and his father offered the condominium to recovering women for no rent or significantly below-market rent and helped over a dozen women during a three-year period. Mr. O'Neil sold the condominium when Mr. O'Neil's father grew too sick to upkeep the unit. *See* Attachment A-1, Dan O'Neil Letter.

Mr. O'Neil has also been an active supporter of the Florida arts community. Gainesville curator Anne Gilroy and Miami artist Juan Travieso both note in their letters that Mr. O'Neil is committed to helping local artists, and Ms. Gilroy noted that Mr. O'Neil has been a dedicated advocate

for the health, well-being, and financial security of artists with limited means and resources. Attachment A-7, Anne Gilroy Letter; Attachment A-8, Juan Travieso Letter. Mr. O'Neil has also been a key member of a coalition of arts supporters who have worked to rescue and restore the Miami Marine Stadium, an historic outdoor waterfront stadium in Miami known for its extensive murals and urban art. As a result of his work with the Art History Mural Project, the National Trust for Historic Preservation, and Friends of Miami Marine Stadium, Mr. O'Neil's volunteer work and advocacy helped lead to a commitment from the city of Miami to support the stadium's restoration, as well as a $500,000 commitment from Miami-based singer Gloria Estefan to support the stadium's restoration. Attachment B, Public Media Articles Regarding Miami Marine Stadium.

## III.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE: CONSPIRACY TO PAY AND RECEIVE KICKBACKS, 18 U.S.C. § 371

Around June 2015, Mr. O'Neil began working at KPN, a marketing company that, amongst other services, generated patient leads for healthcare providers and suppliers. Plea Agreement, ¶ 6. In early 2016, Mr. O'Neil became the President of KPN. *Id.*

Separately, Pakmed was a bracing and orthotics manufacturer owned and managed by Bernie Perconti, and Symed was a Chicago-based durable medical equipment (DME) supplier and pharmacy operated by Mark Sorensen and Paulina Goncharova. *Id.* In 2015, KPN began generating patient leads to orthotic braces pursuant to an understanding reached with Perconti and Pakmed. *Id.* In addition to the patient leads, Perconti and Pakmed engaged KPN to seek and obtain signed, written doctors' orders (i.e., prescriptions) for the services requested pursuant to the patient leads. *Id.* Byte Success was a separate marketing agency run by Christy Anderson that provided the same types of lead generation and doctors' order services as KPN. *See* 01/12/23 Trial Transcript at 792:23–25; 765:23–25; 779:1-25, *United States v. Sorensen*, No. 19-CR-745 (N.D. Ill.); *see also* 01/17/23 Trial Transcript at 1140:3–17, *United States v. Sorensen*, No. 19-CR-745 (N.D. Ill.).

To describe the process at a more granular level, KPN purchased and posted advertisements on websites like betterhealthcare.com. 01/17/23 Trial Transcript at 1077:1; 1078:3. Individuals could respond to the ads, filling out an online form to provide their contact information and consent to be called. *Id.* at 1079:15–25. An individual employed by KPN or a third-party call center would then call the individuals, utilizing a prepared script to have a discussion about a range of medical needs. *Id.* at 1080:25; 1147:1–21. If the individual expressed interest in orthotic braces, KPN would fax an unsigned doctor's order to the individual's self-identified physician, seeking the doctor's signature. *Id.* at 1084:1–25. Employees would fax the order forms to the physician several times, but Mr. O'Neil estimated that roughly 80% of all orders were never signed for any number of reasons, including that the doctor did not agree the braces were necessary and/or wanted an individual appointment with the patient before signing a prescription. *Id.* at 1151:20–25.

If, however, a physician signed an order, KPN would sell the order to Pakmed. Mr. O'Neil knew and understood that Pakmed sold those leads and doctors' orders to Symed. Plea Agreement, ¶ 7. Symed would then take the purchased leads to provide orthotic braces to the named patients, and then submitted claims to Medicare and other federal health care programs for payment for the braces. *Id.*

Initially, Mr. O'Neil expected that Pakmed would pay KPN a flat fee for the leads, and an hourly service rate for efforts to seek and obtain signed doctors' orders. *Id.* Mr. O'Neil worked on developing an agreement to that effect, and even consulted with counsel about structuring an agreement. Quickly after the relationship began in 2015, however, Perconti called Mr. O'Neil and told him that KPN would instead receive a percentage of the revenues that Symed collected from Medicare as its total fee. During that conversation, Perconti told Mr. O'Neil that "lawyers had looked at [the arrangement] and thought it was okay." 01/17/23 Trial Transcript at 1075:7–15. Mr. O'Neil thought the percentage-based arrangement was convenient and expedient. Mr. O'Neil also thought

the arrangement was unusual, but preferred the percentage-based arrangement and so he did not ask further or discuss his concerns with an attorney. *Id.* at 1075:21 to 1076:9. KPN thereafter accepted as payment for its services—patient leads and efforts to obtain a signed doctor's order—a percentage (48%) of what Medicare paid Symed for orthotics braces. Plea Agreement, ¶ 7; 01/17/23 Trial Transcript at 1063:6.

While Mr. O'Neil believed that the payments to KPN were roughly equivalent to what KPN would have received under the originally proposed "flat fee" arrangement, O'Neil acknowledges that he later came to understand that KPN's receipt of percentage payments based on Medicare reimbursements constituted illegal kickbacks. Plea Agreement, ¶ 7.

## IV. THE PRE-SENTENCE REPORT OVERSTATES THE FRAUD LOSS HERE BY RELYING ON TOTAL PAYMENTS BY MEDICARE.

As noted above, the PSR assesses a fraud loss of $24.2 million, the total amount in paid claims from Medicare and other federal health care programs. PSR, ¶ 20. Mr. O'Neil does not dispute the 20-level enhancement, but respectfully submits that the $24.2 million figure overstates the loss here, as it relies on gross income rather than the net benefit.

In kickback cases, § 2B4.1 of the Sentencing Guidelines requires the sentencing court to calculate the offense level based by identifying the "greater of the value of the bribe or the improper benefit to be conferred." In turn, the Guidelines Commentary for § 2B4.1 defines the "value of the improper benefit to be conferred" as the "value of the action to be taken or effected in return for the bribe." Once this calculation is complete, the Guidelines direct the Court to the "loss table" at U.S.S.G § 2B1.1. For purposes of this case, that loss table states that the Court should increase the offense level by 20 levels if the loss amount is greater than $9,500,000 and less than or equal to $25,000,000. *Id.*

When calculating the "value of the improper benefit to be conferred," sentencing courts must determine the <u>net</u> value received by the entire conspiracy, rather than merely the <u>gross</u> value received. U.S.S.G. § 2B4.1 (application note 2); *id.* § 2C1.1 (application note 3); *United States v. Sapoznik*, 161 F.3d 1117, 1119 (7th Cir. 1998) ("[T]he relevant 'benefit received' is indeed profit (net revenue) and not (gross) revenue."); *United States v. Montani*, 204 F.3d 761, 770 (7th Cir. 2000) (instructing court to apply the net benefit to the entire conspiracy, rather than apportioning shares to individual co-conspirators).

To calculate the net benefit, courts must deduct "direct costs" of the conduct at issue, and generally define direct costs as "all variable costs that can specifically be identified as costs of performing a contract . . . for example, transportation costs for the goods in question." *See United States v. Landers*, 68 F.3d 882, 884 n.2 (5th Cir. 1995). In contrast, courts should not deduct indirect costs, which are defined as "costs incurred independently of output," and typically include things like rent, debt, and other overhead costs that a business incurs no matter how many contracts it receives. *Id.* at 885 n.3; *United States v. Sapoznik*, 161 F.3d at 1119. [2]

---

[22] The Seventh Circuit makes clear that sentencing courts should not deduct the value of the bribe when ascertaining the net value of the "improper benefit conferred." *United States v. Montani*, 204 F.3d 761, 771 (7th Cir. 2000). It makes logical sense that courts should not deduct the value of the bribe *as a bribe* from the loss amount, but it does not follow that courts should reflexively treat all payments to a defendant as a non-deductible bribe, without assessing whether the defendant expended direct costs that should be deducted. In related contexts, this Circuit has indicated that sentencing courts must assess which portion of a payment constituted a bribe, and which portion constituted payment for valuable services that can be deducted from a sentencing loss amount. For example, in *United States v. Borrasi,* the Seventh Circuit assessed a kickback scheme where a physician was paid a pretextual salary in return for kickbacks to a facility. *United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011). Applying § 2B4.1, the court calculated the value of the bribe by looking at the defendant's overall salary payments, and then applied a deduction to account for any valuable medical and administrative services the defendant provided in return for the salary. The same approach should apply here—to the extent Mr. O'Neil or others incurred direct costs in the service of this scheme, those costs should be deducted from the Guidelines loss amount.

Here, the PSR does not attempt to determine direct costs of the conspiracy and relies instead on the gross value of paid claims, leading to an higher calculation of the benefit conferred. For example, there is no calculation or deduction of either (1) the actual costs of the braces provided, or (2) the costs that Pakmed paid to ship braces to individual patients. Although Mr. O'Neil does not have access to all the records that would be necessary to estimate these direct costs, the Seventh Circuit has held that it is "the government's burden, not the defendant's, to provide evidence from which these [direct] costs could be estimated." *Sapoznik*, 161 F.3d at 1119.

In the related case of Symed owner Mark Sorensen (Mr. O'Neil's co-conspirator), the government offered estimates for the direct costs of both (1) the orthotic braces themselves, and (2) the transportation/shipping costs for the braces. Specifically, the government estimated that the actual cost of braces provided to and paid for by Medicare between July 2015 and April 2018 totaled $1,112,020 dollars.[3] Separately, the government estimated that the scheme would have incurred $995,660 in shipping costs. Government's Response Memorandum Regarding Loss Amount at 3, *United States v. Sorensen*, No: 1:19-cr-00745 (N.D. Ill. Nov. 8, 2023), ECF 243.

Given the government's direct cost estimates in the Sorensen matter, Mr. O'Neil submits that the overall $24.2 million should be reduced by at least the government's estimated cost of braces ($1,112,020) and the estimated shipping costs ($995,660), for a total of $22,092,320.

In addition to these direct costs, KPN incurred significant additional expenses marketing to patients and obtaining written prescriptions from their doctors. Many of those business expenses—like rent, debt obligations, and salary—are the types of traditional overhead expenses that cannot be

---

[3] Government's Response Memorandum Regarding Loss Amount at 8, *United States v. Sorensen*, No: 1:19-cr-00745 (N.D. Ill. Nov. 8, 2023), ECF 243. In the government's submission, the government explained that these estimates were based on the number of braces that Symed billed and Medicare paid for between July 2015 and April 2018, combined with information that Mr. Perconti provided in October 2023.

tied to specific contracts, and thus should not be deducted when calculating the improper benefit conferred by the offense. KPN also expended significant resources, though, running and managing the lead generation and marketing call center operations that identified patient leads for orthotic braces and obtained signed prescription orders. These expenses bear some of the characteristics of true "overhead" costs—KPN worked with more entities than Pakmed, and therefore generated marketing and call center expenses that were unrelated to the Pakmed relationship. It thus would be inappropriate to deduct all KPN marketing and call center costs from the loss amount here.

That said, these marketing and call center expenses were not truly fixed "overhead" costs that remained unchanged independent of KPN's Pakmed engagement. *See Landers*, 68 F.3d at 885 n.3 (defining non-deductible fixed costs as "costs incurred independently of output" and costs that "a business incurs no matter how many contracts it receives.") Rather, KPN spent significant additional resources on call center and lead generation costs *because of* its engagement with Pakmed and would not have expended some of those resources absent that arrangement. As such, it is appropriate and consistent with Seventh Circuit precedent to consider those costs when calculating the value of the benefit conferred under § 2B4.1.

In *United States v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998), the Seventh Circuit attempted to determine the net value of the benefit that restaurants received from illegal gambling facilitated by a bribery scheme, and reversed the sentencing court for failing to consider evidence that would permit even an approximate estimate of the underlying costs of the enterprise. In doing so, the court held that some "fixed"/overhead costs would not have been incurred but for the conduct at issue, and thus had to be considered when calculating the net benefit:

> It is true that costs that are invariant to the cost of gambling are not costs of gambling. But, for all that appears, the installation of gambling machines requires additional floor space in a bar or tavern. This would increase the fixed costs of the establishment, yet as the increase would be wholly caused by gambling—would be wholly avoidable, in other words, by a decision not to offer gambling—it would be chargeable against gambling revenues. Evidence . . . indicates that some bars turned to gambling because

they were having difficulty making money, and these bars may have remained in business only because of their gambling revenues. *If so, then some or even all of their fixed costs would have to be allocated to gambling because they would not have been incurred had it not been for the gambling.*

*Id.* at 1119 (emphasis added). The situation here is analogous—KPN would not have incurred some significant portion of those marketing and call center expenses but for the decision to engage with Pakmed. As such, they should be considered when calculating the net benefit for purposes of determining the correct loss amount.

Determining the exact proportion of marketing and call center services attributable to the Pakmed relationship would be complex, but not impossible, and the Seventh Circuit has held that "rough approximations, which are usually all that is available for estimating the costs of an illegal enterprise, are good enough." *Id.* at 1120.[4] Based on a rough assessment of KPN's overall marketing and call center expenses from 2015 through 2018, and comparing the relative revenue of the Pakmed relationship to KPN's total business, Mr. O'Neil estimates that several million dollars (~$4.5 million) could fairly be deducted as direct costs associated with the conspiracy. Deducting that amount from the loss amount of $22,092,320, Mr. O'Neil posits that the value of the "benefit conferred" should be calculated as $17,592,320. Ultimately, given the wide range of loss provided by § 2B1.1, Mr. O'Neil recognizes that the net loss approach does not change his Guidelines level. We simply and respectfully raise the calculation concerns to provide the Court with context when determining the appropriate sentence.

---

[4] The Seventh Circuit is not perfectly clear on who bears the burden for establishing deductions, but the government clearly bears some responsibility to provide evidence from which the Court can deduct direct costs of the offense conduct. *See Sapoznik*, 161 F.3d at 1117 ("The government does not deny that it was its burden, not the defendants', to provide estimates from which the costs could be deducted."); *but see United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011) (holding that defendant needs to present rebuttal evidence once the government provides affirmative proof of loss).

## V.   MR. O'NEIL'S COOPERATION WAS EXTENSIVE AND EXTRAORDINARY.

Since confronted with his wrongdoing, Mr. O'Neil quickly accepted responsibility and cooperated. In the intervening six years he has:

- made available relevant business records and physical evidence to the government;

- met with the government team in this case multiple times over the phone and in person, including multiple trips to Washington, D.C. and Chicago for in-person sessions;

- traveled to Chicago in January 2023 and spent nearly an entire day testifying in the trial of Symed owner Mark Sorensen about his role in this conspiracy;[5] and

- provided evidence and assistance in at least four other investigations around the country, based on his knowledge and involvement in the lead generation business, including discussions with government agents as recently as this year regarding new and ongoing matters.

Mr. O'Neil's cooperation was extensive and critical to the government's enforcement efforts in the DME industry and warrants a substantial downward departure.

## VI.   A NON-CUSTODIAL SENTENCE OF PROBATION OR HOME CONFINEMENT WITH COMMUNITY SERVICE WOULD SERVE THE GOALS OF § 3553(a).

The § 3553(a) factors support a non-custodial sentence for Mr. O'Neil.

---

[5] Because Mr. O'Neil contracted COVID at the start of the trial, his trial testimony was delayed for nearly a week, during which time he remained in Chicago until he was able to testify.  PSR, ¶¶ 125–26.

### a. Mr. O'Neil's Offense is Different Than Typical Kickback Cases.

Mr. O'Neil's offense is meaningfully distinct from the typical kickback case, in ways that mitigate against the core concerns of the Anti-Kickback statute. Specifically, the kickback agreement at issue here involved no remuneration or payment to the actual physicians who prescribed orthotic braces, such that the independent medical judgment of the physicians who signed the orders was neither tainted nor impacted by the kickback payments at issue and should have served as an independent check against the provision of unnecessary medical devices.

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A), prohibits knowingly and willfully offering or paying any remuneration in return for referring patients for services that are reimbursable by federal healthcare programs. The traditional "core" example of an AKS violation is a physician who accepts money in exchange for sending his or her patients to a particular health care facility. *See, e.g.*, *United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011) (hospital paid physician sham "salary" for Medicare referrals); *United States v. Patel*, 778 F.3d 607 (7th Cir. 2015) (home health agency paid physician for signing orders authorizing and re-authorizing home health care); *United States v. Moshiri*, 858 F.3d 1077 (7th Cir. 2017) (physician paid for referrals to hospitals).

Without diminishing his wrongful conduct, we respectfully submit that Mr. O'Neil's offense is distinct from these situations in ways that cut against the core concerns of the AKS. Unlike other more "traditional" DME kickback cases, Mr. O'Neil did not pay doctors for prescriptions or use "captive" health-care providers/telehealth providers to obtain prescriptions, which would taint the doctors' independent medical judgment. *See, e.g., United States v. Hagen*, 60 F.4th 932, (5th Cir. 2023) (describing extensive use of telemedicine doctor to sign prescriptions immediately after call where individual expressed interest in orthotic braces).

By contrast, Mr. O'Neil obtained valid doctors' orders by contacting the customers' identified physicians directly and requesting a signed prescription. Mr. O'Neil did not provide remuneration to

those physicians or any others, and KPN's only interactions with the physicians were to send them prepared fax orders multiple times seeking a signature. As such, the doctors continued to serve (or should have) as independent gatekeepers to obtaining the orthotics braces. As Mr. O'Neil testified, around 80% of the pre-filled doctor's orders were never signed by physicians, despite KPN sending them to the physician's offices multiple times. 01/17/23 Trial Transcript at 1151:20–25.

### b. Overreliance on the Guideline's Loss-Driven Range Risks Overstating Mr. O'Neil's Offense Conduct.

Mr. O'Neil personally received only a very limited portion of the proceeds received as part of the conspiracy. KPN received slightly less than half of the revenues from paid claims (48% of the amount collected from government payors), but the overwhelming majority of those funds were used in the business's operations. As noted above, KPN was a large legitimate business with significant overhead—the company employed anywhere from 20 to 50 employees at any given time, utilized contract call center employees, and expended the lion's share of the costs needed to run advertisements, contact individual patients, and pursue doctor's orders. Furthermore, there is no evidence that Mr. O'Neil used his offense to fund a lavish lifestyle or build his own personal wealth. As such, over-relying on the Guidelines loss-driven range could lead to an overly punitive sentence for an offense in which Mr. O'Neil himself did not see substantial personal gain.

In addition, as noted above, Mr. O'Neil's offense was not a straightforward bribery case where doctors were paid for patient referrals, unlawful conduct that could not under any circumstances be performed in a legal and permissible manner. In contrast, Mr. O'Neil's company provided marketing services, contacted patients, and pursued doctors' orders for Pakmed. Ultimately, Mr. O'Neil's offense stems from the fact that KPN was paid on the basis of the referrals it provided to Pakmed in violation of the Anti-Kickback Statute, rather than being paid for the services it provided to Pakmed. With additional diligence and care, those services could have been structured and provided in a lawful

manner that complied with the statutory and regulatory requirements of the Anti-Kickback Statute. For example, the personal services and management contracts safe harbor, 42 C.F.R. § 1001.952(d), would permit a company like Pakmed to pay a third-party agent like KPN for services like the lead generation and doctors' order services, provided that the arrangement met certain requirements like a written contract with a term of at least one year and a clear compensation methodology that was consistent with fair market value in arm's length transactions, and which did not take into account the volume of referrals generated between the parties. *Id.*

This observation is not intended to in any way diminish or negate Mr. O'Neil's criminal misconduct—Mr. O'Neil knows that his conduct did not comply with the safe harbor, that he prioritized profit and convenience over legal compliance, and that he chose not to discuss his concerns with an attorney. As he testified, he is sorry and fully accepts responsibility. The point here is simply that the facts and circumstances unique to Mr. O'Neil caution against formalistic reliance on the loss-driven range.

### c. A Non-Custodial Sentence Avoids Unwarranted Sentencing Disparities.

Similarly situated defendants, including Mr. O'Neil's co-conspirator who provided the same marketing and lead generation services to the conspiracy at issue here, have received sentences well below the advisory Guidelines range (including non-custodial sentences), counseling in favor of a non-custodial sentence for Mr. O'Neil to avoid unwarranted sentencing disparities.

As an initial matter, all of Mr. O'Neil's co-conspirators have received sentences significantly below their Guidelines ranges, demonstrating that Mr. O'Neil should similarly receive a significant downward variance to avoid an unwarranted sentencing disparity. In March, Symed owner Mark Sorensen, who denied guilt and went to trial, received a sentence of 42 months' incarceration, a downward variance 44% below the low end of his Guidelines range. Judgment, *United States v. Sorensen*, No. 19-CR-745 (N.D. Ill.), ECF No. 285. In May, Pakmed owner Bernie Perconti received a sentence

of 18 months' incarceration, a downward variance that was 60% below the low end of his Guidelines range. Judgment, *United States v. Perconti*, No.19-cr-762 (N.D. Ill.), ECF No. 63.

Mr. Sorensen and Mr. Perconti are not the most appropriate comparator for Mr. O'Neil's sentence. As noted above, Christy Anderson was a fourth co-conspirator in this scheme. Just like Mr. O'Neil and KPN, Ms. Anderson and her company Byte Success played the same role in this conspiracy—providing lead generation, marketing, and doctor order services to Pakmed. *See* 01/12/23 Trial Transcript at 792:23–25; 765:23–25; 779:1-25, *United States v. Sorensen*, No. 19-CR-745 (N.D. Ill.), ECF. No. 206; *see also* 01/17/23 Trial Transcript at 1140:3–17, *United States v. Sorensen*, No. 19-CR-745 (N.D. Ill.).

Like Mr. O'Neil, Ms. Anderson cooperated with the government's investigation in this and other matters. In April 2022, Ms. Anderson was sentenced (based on a statement of facts for a similar but factually distinct kickback scheme) to three years' probation, without any added conditions like home confinement. Given the similarities between O'Neil and Anderson, her non-custodial sentence is the most appropriate comparison for determining Mr. O'Neil's sentence, counselling in favor of a non-custodial home confinement sentence for Mr. O'Neil.

In addition, publicly available data from the Sentencing Commission's Judiciary Sentencing Information platform show that downward variances are common for defendants with the same applicable Guideline and Guidelines range. Between 2019 and 2023 (the period during which the government's investigation occurred and Mr. O'Neil's sentencing has been pending) there have been 30 defendants reported to the Commission whose primary guideline was § 2B4.1, with a final offense level of 23 and a Criminal History Category of I. For those 30 defendants, 84% of the

defendants received a below Guidelines sentence, either because of a § 5K1.1 substantial assistance departure, another downward departure/variance, or some combination of both.[6]

Nor would a non-custodial sentence of home confinement fall outside the norm for individuals sentenced under Guideline § 2B4.1 in the Seventh Circuit. Public data provided by the Sentencing Commission in its Interactive Data Analyzer indicate that between 2019 and 2023, there have been 19 individuals sentenced within this circuit with a primary guideline of § 2B4.1 and a Criminal History Category of I.[7] For those 19 sentencings, slightly more than half (52.6%) resulted in a sentence of probation or probation with alternatives (which would include home confinement). Within the Northern District of Illinois, there were 17 individuals with a Criminal History Category of I sentenced under § 2B4.1 during the same period, and an even higher percentage (58.9%) of those sentences resulted in probation or probation with alternatives.[8]

### d. Probation or Home Confinement Would Provide Specific and General Deterrence.

Here, probation or home confinement would serve as a just punishment to Mr. O'Neil and provide specific and general deterrence against future criminal conduct. Over the past four years, Mr. O'Neil has indisputably demonstrated that he understands the severity of his offense and will not repeat this offense or commit others. During this period, Mr. O'Neil has complied with all the conditions of his release. Perhaps recognizing Mr. O'Neil's exemplary behavior, the Court even

---

[6] United States Sentencing Commission, Judiciary Sentencing Information, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited August 15, 2024).
[7] United States Sentencing Commission, Interactive Data Analyzer, "Sentencing Outcomes-Sentencing Type," https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited August 15, 2024). Unlike the JSIN database described above, the Interactive Data Analyzer does not permit the viewer to limit the data to individuals with the same offense levels.
[8] United States Sentencing Commission Interactive Data Analyzer, "Sentencing Outcomes-Sentencing Type" https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited August 15, 2024).

modified the conditions of his release in June 2021, permitting him to travel within the contiguous United States without the Court's prior approval. June 17, 2021 Order on Conditions of Release, ECF 26.

During that same period, Mr. O'Neil changed his life to further avoid any recurrence of his wrongdoing. In addition to undergoing intensive therapy and tackling his addictions, Mr. O'Neil left the lead generation industry entirely behind him, giving up more lucrative opportunities to find gainful employment that has nothing to do with his prior career. He now works in RV sales, in a role that allows him to provide some support to his wife and stepdaughter, and which he would be able to continue by working from home if he were sentenced to home confinement. If the Court were to sentence Mr. O'Neil to probation or home confinement, he would be able to maintain his employment and provide for his family, while maintaining access to the support structure and treatment options (as needed) that have helped him to turn the page on his crime and prior life.

In addition, a sentence of probation or home confinement with significant community service is a serious punishment that would also serve as a general deterrent to others who might consider committing the same offense as Mr. O'Neil. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishment do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). Research regarding white collar offenders in particular found no difference in the deterrent effects of probation and that of imprisonment. David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

## CONCLUSION

Craig O'Neil—a family man, hard worker, and generous friend—stands before this Court contrite and having accepted responsibility for his conduct. For the reasons stated, we respectfully

submit that a sentence of probation or home confinement, coupled with community service, is sufficient to satisfy the purpose of sentencing.

Respectfully submitted,

/s/Zachary Fardon
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
+1 312 764 6960
*Attorney for Defendant Craig O'Neal*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that this document was served on August 15, 2024, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/Zachary Fardon
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
+1 312 764 6960
*Attorney for Defendant Craig O'Neal*